May I please record, my name is Kyle Reuter, I represent the Juan Oliver. I would like to reserve two minutes for rebuttal. Thank you. Although four issues were raised by Mr. Oliver on appeal, I believe only the first issue could actually have an impact on a sentence. Mr. Oliver pled guilty and there was a plea agreement of cap of 10 years and he was sentenced to nine years. With the cross-reference for someone who was engaged in prostitution, engaging others in prostitution by use of force, his guideline sentence went up to life. So if you designed the first issue against Mr. Oliver, issues number three and four will have no practical impact on his sentence. So I'd like to focus my attention on the cross-reference. Yeah, I would just add to what you said. If he gets the cross-reference and he gets no SOCs and no adjustments, he's still over the statutory max. He still has a guideline range of 121 to 151 months. That is correct, but I believe the cross-reference is important here because I think assumptions were made not only by the government, by the sentencing court as to what a pimp does in The definition of a pimp includes discipline. He was someone who was known as the new millennium pimp, but he wasn't disciplining his prostitutes. He lived off them. He controlled them. He recruited them, but he wasn't disciplining them. And I don't believe the government presented enough evidence at sentencing to show that he was forceful or that he was someone who on his own punished anyone in his employ. Even if we accept that, as long as it's reasonably foreseeable that his co-conspirators would, he's in for that, isn't he? If he determined he was reasonably foreseeable as the trial judge did, then yes, he would be, but again... Tell us why it was not reasonably foreseeable that a conspiracy of this magnitude, some 16 pimps over 15 states with over 150 women, why would it not be reasonably foreseeable that others would have used force? Because as Mr. Oliver demonstrated, the use of force was not necessary. Therefore, one of the problems is there must be a furtherance of the activity. Use of force with the prostitutes, as he demonstrated, was not necessary. You did not have to strike, punish the prostitutes to be able to make money off them. But it was foreseeable that force would be used. No, it wasn't. The testimony of the co-operators makes that absolutely clear. The testimony of the co-operators goes to the generalization that all pimps do it this way, which is not the case. All pimps do not do that. You're back to him, though. You're back to Mr. Oliver now. It was foreseeable to him, and that's the argument. It was not foreseeable to him that we need to use force and that others are using force. He didn't do it that way. That's not the way he did it. So his role in the conspiracy, which was limited, his role in the actions was he did it his way, and he actually was punished for that or castigated by others. Why did they castigate him? Because he was doing it his way. He was doing it differently. And why did they want him to do it? They wanted him to be the old school, the old way pimp. He presupposes that they were the old school method. They were the old school method, but it doesn't necessarily make it foreseeable. It has to be. Again, in furtherance of the activity, you don't have to do that to make money off the prostitutes. Is that the test, though, that you have to do it, or is it the test that it was foreseeable that it would be done, irrespective of the necessity of doing it? If you're going to attribute conduct to Mr. Oliver, number one, you must demonstrate, demonstrate that it was in furtherance of the jointly undertaken activity. The jointly undertaken activity was to live off the work of others, the prostitutes. There was not in furtherance of that because you did not have to do so. Just because it was done that way in the past doesn't mean you had to do so. So for Mr. Oliver, who was, I remind the court, 19 years of age, early 20s during this time period, it was not something that needed to be done. It wasn't in furtherance of the jointly undertaken activity. He proved that by doing it his own way. Well, just because he may not have needed to do it that way, how does that translate into the others not having to do it that way? And that's why it was a loosely based conspiracy. He didn't know that several of the others were older and that they'd been in this business for many years. He didn't know that there were older pimps that'd been in it for years. He did not know exactly what they were doing. And that, again, why he was looked unfavorably by the other. But the pimps, the government had evidence presented that in a telephone call he was actually threatened and others were conspiring against him. He was on the outside, essentially, doing his way. He wasn't on the outside with that phone call with reference to Jessica Klempner. The phone call to which you're referring, though, was not referencing violence. It was a find a way to silence her. But he wasn't on the outside. No. And he was on that phone call with a lot of, from Williams on down, several of the pimps. It was a conference call, yes, and perhaps the best evidence to show the conspiracy by the government. And they're calling him by his nickname, one or two. Yes. Both his nicknames. So he was well known to them. He was known to them. And there is evidence in the record that he slapped the Tyra, the mother of his youngest child, who was a prostitute for him. Now he denies it. And it was unsubstantiated because the person who was slapped does not even acknowledge that. It was someone saying that that did occur. So I don't believe it's substantiated enough to be used as evidence against Mr. Oliver, so his violence. Your argument is that it was not foreseeable to him that violence would be used by other of his pimp partners? Is that your argument? That's the argument because he did not have to do it. But that isn't the answer to the foreseeable that his pimp partners would use violence. Separate about what he would do, was it not foreseeable to him that his pimp partners would use violence? No. He was new. He was young. He was not involved in training by these people. In fact, he stepped on their toes by coming to their territory. And because he did not use violence, it was not foreseeable to think that others were also doing the same. Was he from Toledo also? He was from Toledo also. So how did he get connected with the other pimps? He started out as a lawyer, petty crimes, moved to selling narcotics. And then one customer he was selling to was a woman who was a prostitute. And she actually took him to the strip or whatever they call it in Toledo to show him the ropes. And from there, he decided... Which woman was that? I'm sorry. I don't believe it was one of the co-defendants or co-conspirators. It was in the past. And from there, he met up with others who were already prostitutes, who were already adults. And presumably, he met up with some of the pimps in Toledo too. He met up with one or two. He never acknowledged that one of the co-defendants was his father who was a pimp. He still to this day would not acknowledge that as his father. That would be Robert Scott Sr. But he knew Scott was one of the pimp partners. He did know he was one of the pimp partners. And what do we know about Robert Scott Sr.'s methods? Old school pimp. He would use violence. He would discipline. I know that from the discovery from the trial transcripts. But I can't say that my client knew that when he started out or when he did his job. Nor can I say that it was foreseeable for him. Because, again, he was going against the stereotype and doing something different. And, actually, that was part of the recruitment method by his women. Comes to Duane Albury. He doesn't beat you. He's a new millennium pimp. Just the fact of it strikes me as a bit of a hoax by your own petard argument there. Because for him to recruit people by suggesting he's going in a different direction presupposes he knows what the old method was. He wasn't doing the recruiting and saying that. It was the women who worked for him who were already in the game, who were already prostitutes for a number of years and were subjected to these pimps. How did he get the first prostitute then? He had to recruit somebody. A woman approached him and said, I'm a prostitute. Would you like to be my pimp? And from that point on, because he did it his way, people came to him. Let's assume we disagree with you on the cross-reference. Or let's assume we don't take a position at this point on the cross-reference. Are you waiving your other objections to the various enhancements? I am not waiving my objections. Are you relying solely on the cross-reference argument? No, I'm not relying solely on the cross-reference. I believe the other issues have merit, such as counting victims as participants in the calculation for the four levels in the rule of defense. I believe that's important because by definition in the guidelines, one can't be the other. But because the judge looked at this as an extensive undertaking, she was, I believe, counting the participants as victims and vice versa. I think we'll get to that with your friend across the aisle. But let's assume we were to agree with you in law. Let's assume we disagree with you in the cross-reference. His guideline range is still 360 to life. That is correct, and there's nothing I can change about that. And the statutory max is 120 months. The statutory max is 120 months, and he was sentenced to 108 months. Which the district court gave him the benefit of the bargain. It fell apart. Correct. And I believe she did so because of his lack of knowledge and understanding of what was going on at the time of the change of plea hearing. So even if she earned on one or more of the enhancements, why would it not be harmless error? Why shouldn't we look at the 108 months and still find that to be reasonable under Booker? You could do so. You could say it's harmless error. However, I believe that if the cross-reference doesn't apply and at level 14, then all other adjustments that could have occurred, may have occurred, could have brought the sentence down below 108 months. If the cross-reference doesn't apply, this would have to go back, I would imagine. At least for an evidence you're hearing regarding the adjustments and or variances, yes. But again, I'm not waving the other two arguments. I believe that the first one would carry the day if necessary, then we get to the others. Thank you. Any questions? We'll get you a rebuttal. Thank you. Mr. Zubrod. May I please have a question? My name is Gordon Zubrod, and I am the Assistant United States Attorney handling this case. My colleague at the table is Ted Smith, who will be arguing the companion case next week in United States v. Williams. The core issue, as my colleague has pointed out, is whether this cross-reference under 2G 1.3 applies. One way or another, this ends the case, either for the defense or for the prosecution. If 2G 1.3 does apply, then the cross-reference is to 2A 3.1, which has a guideline level of 30, which at a criminal history category of 3 is 121, 151 months, and you've got a sentence of 108 months. Whether the other enhancement applies, really, in terms of where the guideline level is material. You negotiated a plea agreement under which Oliver's maximum sentencing exposure is 120 months. Yet, before the district court and before us, you have pressed enhancement after enhancement, adjustment after adjustment, to the point where his guideline offense going into sentencing was a life imprisonment. You just said what you said about the cross-reference. Did you do that because you have no confidence in the cross-reference's application to Oliver? No. Because I don't understand why in heaven's name you have pursued with such dogged enthusiasm all of these enhancements when he can't get more than 120 months. Well, one, for consistency. We don't want to concede an issue that applies with a great deal of force elsewhere. But secondly, because we looked at the relative culpability of the defendant compared to the others who referred themselves as guerrilla pimps and concluded that All the more reason why you wouldn't pursue all these enhancements. Well, all the more reason why we would put a cap on exposure. You were discussing a nine-year sentence. In fact, the district court says the sentence they have crafted here, you've crafted a nine-year sentence. I don't know what happened to Congress in all of this, but that's another story. It is within the discretion of the United States Attorney to, in trying to find, avoid sentencing disparity, to give the lesser figure a lesser sentence. And we did it, not by conceding things that under the law we shouldn't concede, but by getting a cap. There's a real disconnect here because you, I'm sure, understand our procedure and our reasonableness doctrine and it just doesn't strike me as in the interest of justice from anyone's viewpoint, whether it be the defendant, the government, or the court, trial or appellate, to have the United States piling on enhancement upon enhancement, running the risk that one or more of those enhancements might be deemed incorrect. The case comes up to this court. This court finds one or more of them incorrect. The case goes back down to the trial judge. The trial judge imposes the same sentence. This becomes a bizarre kabuki dance that strikes me as a colossal waste of resources. Why would the government undertake that risk of being reversed for procedure and reasonableness? Don't you have other pressing business to attend to? Judge, how do I argue with a straight face that a certain guideline does not apply, a certain enhancement does not apply, when clearly it does? For instance, the cross-reference. Why should I argue if we're going to recommend a 120-month sentence? Because there is admissions by party opponent to say, no, under these circumstances there is none, when clearly there is. This is an individual who's what they call the bottom bitch. When one of the girls tried to leave his employee, she went after her and stabbed her. Now, why wouldn't the cross-reference apply? That's a fair response, but why wouldn't you at least protect yourself in arguing the alternative? Judge, even if we're wrong on this enhancement, we're still at a cap of 120. What's the harm in that? Well, I think the thing speaks for itself. The very first statement that the court made when the sentencing hearing opened is, I understand I'm on a 120-month cap, and I understand why the government did it. And then she went through a very lengthy series of findings as to why that was an appropriate sentence under this particular individual. I don't think anyone is suggesting that it isn't an appropriate sentence, perhaps given his par vis-a-vis the other defendants in this case. That, I think, is not what concerns Judge Hardiman or myself. We're just talking about where he cannot get more than 120 months. Why are we dealing with enhancements that get him up to life imprisonment? Well, as the court's aware, the dynamic of how those enhancements come about do not come from recommendations from the United States. They come from the pre-sentence investigation report. Once that comes out, then we are asked, do we have objections to that? Who gives probation the information that goes into the pre-sentence report? We turn over all the information to the defense, as does the defendant. In this case, there's something I've never seen. Maybe it happens, but you've got a representation from the U.S. Attorney's Office. You didn't even put into the record the statement of the deceased. I believe it was Samantha Walker. What addition of reliability should we find in a district court taking as true a statement in the pre-sentence report that's a representation by a litigant, the United States, that a decedent said something and gave a statement,  I've never seen that before. Is that something that happens in the middle district? The statement was given to the probation office, which put the statement into the pre-sentence investigation report. What did the probation department put in? She said that she started with him when she was 14. At page 6 of paragraph 21 of the DSR, it gives a summary of the testimony, which runs... What testimony? A summary of the statement of the deceased, that at age of 14, she had been recruited by the defendant, that he picked her up in the south side of Toledo, Ohio, that they traveled to Illinois, that he trained her and told her how much she was to charge. He dressed her with clothing appropriate to a prostitute, that he provided her with a fake identification card, that he then took her to Atlanta, Georgia, to... Where did they get that information from, from government? From probation interviewed her. Probation got the FBI through to the formal police interview of her. Yes. And all the district court found on that, on the Samantha Walker thing, that the enhancement was, quote, appropriate in this case based on the involvement of Samantha Walker. Period. That's it. There's really no support for anything else that is in the pre-sentence report vis-à-vis. There's certainly no findings by the district court. Well, the court did make a finding. What is the involvement? Where is the involvement of Samantha Walker? What does involvement mean here? What do you think Judge Kane meant by her involvement? Well, I presume she followed the statement of Samantha Walker that contained in the pre-sentence report that she was recruited for prostitution purposes, she was trained as a prostitute, she was taken across the United States by the defendant in the company of these other girls to various truck stops. And she presumably also in paragraph 39 of the pre-sentence report accepted what probation said, which was that the prostitutes were victims for purposes of role in the offense but made no findings about organize or leader. She made a finding that was otherwise extensive. She made no finding about who he organized or led. And our case highway is very, very clear. The application notes are very, very clear that there must be one participant that he organized and led in addition to himself. Correct. All she found with reference to the role adjustment was this, quote, I do not find that the defendant was an organizer or leader above the other pips, but I find that the otherwise extensive language of this particular enhancement makes it applicable to the defendant. There's no statement that he organized or led any one participant. Is there? And you would agree he has to organize or lead one participant. Are we shifting away from the 14-year-old because I think there was a basis in the record for her finding that this was one that she could count and why this witness was more credible than the defendant was on that. I'm prepared to discuss that, but if the court wants to go to otherwise extensive, I'll go to that. I don't know. I won't ask any more. You talk that way. All right. Let me just briefly close off on ASW. Note that if you look at the record as to why the court accepted her statement over the defendant's, the defendant, number one, denied any knowledge of her, denied any involvement with any juvenile, and yet he admitted that he prostituted R.B., who was a 16-year-old. R.B. testified that she was prostituted by him, so there's a credibility question that begins right there. Additionally, this is a statement by ASW against her penal interest under Federal Rule of Evidence 804B3. It was a police report. It was a formal interview. Weighing the two, and remember, it is not beyond a reasonable doubt. It's a preponderance standard. She found that that child was, in fact, used. She also described Oliver's operation, places of travel, other women that he prostituted. She found that to be more credible than the blank denial of Oliver. Now, regarding the otherwise extensive under 3D1.1, what we're referring to are the antico factors, the helbling factors. And you separate out participants. Under the four-prong test, you separate out the participants from the non-participant. A defendant may be counted as a participant. The sentencing court must decide whether the defendant used each non-participant services with a specific intent, and the court said it hasn't determined the extent to which the services of each individual non-participant were peculiar and necessary to the criminal scheme. But there's a second requirement here, and that is that he organize or lead one participant. Who was the one participant? Because the district court made no such finding. What participant did he organize or lead? As you look at the pre-sentence report, he identified a series of women who were prostitutes. Who did the district court find that he organized or led? I think what we're coming down to is the court made a specific finding that he did. It is the function of the court of appeals to determine whether or not the record supports that finding. Take a look at paragraph 39 of the pre-sentence report, and you tell me if there's any reference in there to one participant that he organized or led. All they mention in that paragraph 39 are prostitutes. The prostitutes were not participants. They are non-participants. That's right. And he had eight girls who he admitted prostituted. And you can use that for the otherwise extensive prong, but you cannot use them for the organize and lead one participant prong. There must be a participant. Now, participant is defined in Heidling as a person who is criminally responsible for the commission of the offense. That's right. That cannot be a prostitute. It cannot be a prostitute. So I go back to my first question. Who did he organize or lead? Which participant did he organize or lead? You've got to know if there is one. Yes. He worked in conjunction with others, but he was not himself a leader. He was otherwise extensively involved. But he has to be an organizer or leader for the four-point law enhancement. I think that is stated in the disjunct. No. Read Heidling. There are two requirements. Organize and lead one participant and otherwise extensive, so you have the equivalent of five participants of which the victims will be counted. If you want organization, he was. I don't have any problem with the otherwise extensive. What I have a problem is finding who he organized and led. That's the telephone conversation. Name. Name. Who did he organize or lead? What participant? Williams, Banks. He led Williams? He was involved in the organization. He led Williams? He was involved in the organization. He was with his organizer and leader? He can organize or lead. He organized. He was part of organizing the kidnapping of J.K. Well, okay. I'll give you a couple of extra minutes. I promise you now I will not ask another question. I lied last time. Well, I come back to that what ends this one way or the other is whether the cross-reference applies. The other vulnerable victim, otherwise extensive, and so on, that doesn't affect the outcome, and that's our argument. Thank you. Rebuttal. Thank you, Your Honor. Regarding the issue concerning the credibility and whether there was an admission by Mr. Oliver of the use of a juvenile, I believe it's been overstated by the government. What the statement was is when Mr. Oliver was a juvenile, he rode from Toledo, Ohio, to Harrisburg for the first time in the company of three other people. He then returned with one of the persons after one night where the other stayed there. He didn't admit to being a victim for this JV, nor that he was in the process of recruiting her as a juvenile to be a prostitute. That was the only acknowledgment. So when it comes down to credibility regarding juvenile, all we have is an unsubstantiated report of Samantha Walker and the statement of this JV that she rode to Pennsylvania and that Mr. Oliver acknowledged riding back to Toledo, returning to home. Regarding the organizational issue, I believe the judge looked at it as Mr. Zubrow did in the disjunctive, that it was an or, not an. And I believe that was incorrect. But it does come down to, and I think my arguments, I would be remiss if I didn't say, it doesn't have an effect unless the cross-reference is overturned. And that's the only way that any decision by this court can impact a potential sentence for Mr. Oliver in a positive way going below the 108 months. Thank you. Thank you. Any questions? Any questions? Thank you very much. The case is very well argued. We will take it under advisement. Thank you.